**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HENGGAO CAI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DATACAMP, INC.<br><br>Defendant. | Civil Action No. 1:25-cv-00954 |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(1) AND 12(B)(6)**

COZEN O'CONNOR
Max E. Kaplan
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone: 215-665-2000
Fax: 215-665-2013
mkaplan@cozen.com

*Attorneys for Defendant*
*DataCamp, Inc.*

# TABLE OF CONTENTS

Page


INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 2

A. The Video Privacy Protection Act ..... 2

B. DataCamp's Educational Platform ..... 3

C. Plaintiff's Conclusory Allegations ..... 5

D. Plaintiff's Active Publicity of His Own DataCamp Activity ..... 6

E. Plaintiff's Agreement to DataCamp's Terms of Use and Privacy Policy ..... 7

ARGUMENT ..... 9

I. Plaintiff Lacks Article III Standing as a Matter of Fact ..... 9

A. Standard Applicable to a Rule 12(b)(1) Motion to Dismiss ..... 9

B. Plaintiff Cannot Demonstrate an Injury-in-Fact as Their Was No "Public" Disclosure of His "Private" Information ..... 9

a. Plaintiff, Not DataCamp, Publicized His DataCamp Activity ..... 10

b. Plaintiff Granted DataCamp License and Consent to Disclose His DataCamp Activity. ..... 13

c. Unlike Plaintiff's Publication of His Information, Any Disclosure by DataCamp Remained Private. ..... 14

II. Plaintiff Cannot State a Claim Under VPPA. ..... 15

A. Standard Applicable to a Rule 12(b)(6) Motion to Dismiss ..... 15

B. Under the Second Circuit's "Ordinary Person" Standard, Pixels Do Not Transmit "Personally Identifiable Information." ..... 16

C. Plaintiff Fails to Allege DataCamp Transmitted PII, as DataCamp URLs Do Not Identify "Specific Video Material." ..... 19

D. The Complaint Does Not Allege DataCamp Possessed or Disclosed Plaintiff's PII. ..... 22

E. DataCamp Did Not "Knowingly" Disclose PII. ..... 24

F. DataCamp Is Not a "Video Tape Service Provider," and Plaintiff Is Not a "Consumer," Under VPPA. ..... 26

CONCLUSION ..... 27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662, 678 (2009)....15, 16

*Austin-Spearman v. AMC Network Ent. LLC*,
98 F. Supp. 3d 662 (S.D.N.Y. 2015)....23

*Barclift v. Keystone Credit Services, LLC*,
93 F.4th 136 (3d Cir. 2024)....14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....15

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
2017 WL 3727230 (S.D.N.Y. Aug. 11, 2017)....24

*Buechler v. Gannett Co., Inc.*,
No. 22-1464, 2023 WL 6389447 (D. Del. Oct. 2, 2023)....23

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994)....24

*Cenveo, Inc. v. Rao*,
659 F. Supp. 2d 312 (D. Conn. 2009)....23

*Chaney v. Fayette Cnty. Pub. Sch. Dist.*,
977 F. Supp. 2d 1308 (N.D. Ga. 2013)....11

*Chutich v. Green Tree Acceptance, Inc.*,
1993 WL 173813 (D. Minn. Apr. 19, 1993)....22

*U.S. Airlines Pilots Ass'n ex rel. Cleary v. US Airways, Inc.*,
859 F. Supp. 2d 283 (E.D.N.Y. 2012)....9

*Crandon v. United States*,
494 U.S. 152 (1990)....23

*Crane v. Am. Bar Ass'n*,
663 F. Supp. 3d 747 (E.D. Mich. 2023)....11, 12, 13

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017)....10, 16, 22

*Ghanaat v. Numerade Labs, Inc.*,
689 F. Supp. 3d 714 (N.D. Cal. 2023) ....................19

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015)....................22

*Griffith v. Steiner Williamsburg, LLC*,
760 F. Supp. 2d 345 (S.D.N.Y. 2010)....................23

*Guadagno v. Wallack Ader Levithan Assocs.*,
932 F. Supp. 94 (S.D.N.Y. 1996) ....................4, 9

*Hesse v. Godiva Chocolatier, Inc.*,
463 F. Supp. 3d 453 (S.D.N.Y. 2020)....................20

*hiQ Labs, Inc. v. LinkedIn Corp.*,
2021 WL 1531172 (N.D. Cal. Apr. 19, 2021) ....................12

*Hudson v. Datanyze, LLC*,
2025 WL 80806 (6th Cir. Jan. 13, 2025) ....................12

*In re Hulu Priv. Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) ....................22, 24

*Hunstein v. Preferred Collection & Mgmt. Srvs., Inc.*,
48 F.4th 1236 (11th Cir. 2022) (en banc) ....................14

*Lamb v. Forbes Media, LLC*,
2023 WL 6318033 (S.D.N.Y. Sept. 28, 2023)....................25

*Lee v. Springer Nature Am., Inc.*,
No. 24-4493, 2025 WL 692152 (S.D.N.Y. Mar. 4, 2025)....................25

*Markels v. AARP*,
689 F. Supp. 3d 722 (N.D. Cal. 2023) ....................26, 27

*Martin v. Meredith Corp.*,
657 F. Supp. 3d 277 (S.D.N.Y. 2023)....................15, 19, 21

*Martinez v. D2C, LLC*,
2024 WL 4367406, at 7 (S.D. Fla. Oct. 1, 2024)....................25, 26

*Mollett v. Netflix, Inc.*,
795 F.3d 1062 (9th Cir. 2015) ....................23

*Nabozny v. Optio Solutions LLC*,
84 F.4th 731 (7th Cir. 2023) ....................14

*Nat'l Basketball Ass'n v. Salazar*,
Case No. 24-994 (Pet. Writ Cert. Mar. 14, 2025) ....................15

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016).................... 3, 10, 16, 17

*Osheske v. Silver Cinemas Acquisition Co.*,
2024 WL 5487091 (9th Cir. Mar. 27, 2025).................... 26, 27

*Salazar v. Nat'l Basketball Ass'n*,
118 F.4th 533 (2d Cir. 2024) .................... *passim*

*Salazar v. Paramount Glob.*,
133 F.4th 642 (6th Cir. 2025) .................... 15, 26, 27

*Shields v. Professional Bureau of Collections of Maryland, Inc.*,
55 F.4th 823 (10th Cir. 2022) .................... 14

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) .................... 6, 23

*Solomon v. Flipps Media, Inc.*,
2025 WL 1256641 (2d Cir. May 1, 2025) .................... *passim*

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016).................... 9

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021).................... 10, 14, 15

*United States v. Gines-Perez*,
214 F. Supp. 2d 205 (D.P.R. 2002).................... 11

*United States v. Meregildo*,
883 F. Supp. 2d 523 (S.D.N.Y. 2012).................... 10, 11, 12, 13

*United States v. Sylvester*,
605 F.2d 474 (9th Cir. 1979) .................... 23

*Willingham v. Global Payments, Inc.*,
2013 WL 440702 (N.D. Ga. Feb. 5, 2013) .................... 24

*Worix v. MedAssets, Inc.*,
869 F. Supp. 2d 893 (N.D. Ill. 2012) .................... 24

**Statutes**

18 U.S.C. § 2710.................... *passim*

Defendant DataCamp, Inc. ("**DataCamp**") respectfully submits this memorandum of law in support of its motion pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure ("**Motion**") to dismiss the putative Class Action Complaint ("**Complaint**"), Doc. 1, filed by Plaintiff Henggao Cai ("**Plaintiff**"). As set forth, the Motion should be granted.

## INTRODUCTION

DataCamp is an interactive and community-driven online learning platform focused on computer programing for data science and artificial intelligence. Plaintiff, a longtime DataCamp user, brings this putative class action against DataCamp for alleged violations of the Video Privacy Protection Act, 18 U.S.C. § 2710 ("**VPPA**"). Plaintiff alleges that, when he viewed "videos" on DataCamp's platform, a piece of HTML-code, called a "Pixel," caused his "PageView" and "cookie" information to be transmitted to Facebook and similar sophisticated technology companies. Doc. 1 ¶¶ 22–27, 34. Plaintiff further alleges that, when put together, disparate information embedded in the transmission "permits Facebook to see who watched what video," *id.* ¶ 29, and therefore DataCamp "knowingly disclosed" his "personally identifiable information" without his consent.

This is incorrect. As a threshold matter, Plaintiff did not sustain any injury to any privacy interest sufficient to support Article III standing. To the contrary, Plaintiff's actions—including (a) promoting his DataCamp activity on social media; (b) granting DataCamp broad license and consent to disclose his DataCamp activity; and (c) doing so in venues more public than any alleged disclosure—demonstrate that he already made any allegedly "private" information "public."

Regardless, the Complaint must be dismissed with prejudice because Plaintiff has not (and cannot) state a claim under VPPA. Indeed, the Second Circuit has held that ***information transmitted via Pixel does not trigger VPPA***. *Solomon v. Flipps Media, Inc.*, 2025 WL 1256641, at *10–11 (2d Cir. May 1, 2025) (publication forthcoming). According to the Second Circuit, it is

"implausible" that an "ordinary person" could identify a specific individual's video-watching behavior from "PageView" and "cookie" data transmitted via Pixel. *Id.* This data, therefore, does not qualify as "personally identifiable information," and its disclosure cannot support a VPPA claim. *Id.*

Nor has Plaintiff plausibly alleged that DataCamp "knowingly disclosed" his PII. For one thing, the data purportedly disclosed (embedded DataCamp URL addresses) do not identify any "specific video materials" as required to state a claim; rather, they use content-neutral numbers to direct browsers to diverse, interactive exercises. Further, noticeably absent from the Complaint are any non-conclusory allegations that DataCamp (not a third party) itself possessed or disclosed Plaintiff's PII, or that DataCamp was aware his PII was disclosed. *Cf. id.* at *3 ("c_user cookies are created and placed by Facebook on the Facebook users' browsers, [and] only Facebook's servers can access them.").

Finally, DataCamp is not a "video tape service provider," and Plaintiff therefore is not a "consumer." DataCamp is an online education provider focused on offering interactive courses, projects, and certifications to its community of learners. That DataCamp allegedly offers "video courses" as part of its broader curricula is insufficient to transform its interactive platform into Blockbuster Video.

## FACTUAL BACKGROUND

### A. The Video Privacy Protection Act

VPPA is a penal statute codified under Title 18 of the U.S. Code ("Crimes and Criminal Procedure"), which prohibits a "video tape service provider" from knowingly disclosing the "personally identifiable information" of a "consumer" without consent. 18 U.S.C. § 2710(b). "Video tape service provider"[s] are persons "engaged in the business…of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." § 2710(a)(4). "Personally

identifiable information," in turn, means "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." § 2710(a)(3). If an ordinary person cannot decipher the information, it is not identifying information under VPPA. *Solomon*, 2025 WL 1256641, at *9. And the term "consumer" is defined as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." § 2710(a)(1). A VPPA violation may result in civil penalties, punitive damages, and attorneys' fees. § 2710(c)(2).

Consistent with its penal character, VPPA's intended scope was and remains "quite narrow." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 284 (3d Cir. 2016). Enacted in 1988, VPPA was passed after a newspaper published an article identifying films rented by a Supreme Court nominee from a local video store. *Solomon*, 2025 WL 1256641, at *1; *see also* S. Rep. No. 100-599, at 4 ("[A] state has no business telling a man, sitting alone in his house, what books he may read or what films he may watch."). In 2013, Congress amended VPPA's definition of "written consent" to include online video rentals, as "the Internet ha[d] revolutionized the way that American consumers rent and watch movies and television programs." *Salazar v. Nat'l Basketball Ass'n,* 118 F.4th 533, 545 (2d Cir. 2024). Congress declined, however, to amend any other definition, despite testimony asking for "personally identifying information" to be expanded to include, e.g., IP addresses. *Solomon*, 2025 WL 1256641, at *10. In this way, Congress maintained VPPA as a limited penal statute with a different, narrower purpose than other, broader privacy laws that explicitly address this type of information. *Id.*

**B. DataCamp's Educational Platform**

DataCamp is an online learning platform focused on computer programing for data science and artificial intelligence, offering interactive courses, projects, and certifications to help learners upskill and build their data and artificial intelligence skills. Declaration of Eduardo Oliveira

("Oliveira Decl.") ¶ 3.[1] Learners—either through individual or institutional (company; university) accounts—may access DataCamp's learning platform through its website, datacamp.com ("**Platform**"). *Id.* ¶ 4. There, learners may take full, interactive courses in subjects ranging from introductory computer programming (e.g., "Introduction to Python") to more advanced topics (e.g., "Advanced Probability: Uncertainty in Data"). *Id.* ¶ 5. Like a university course, each DataCamp course is divided into "chapters" capturing subtopics, with each chapter, in turn, composed of modular interactive exercises, including multiple-choice exercises, terminal coding lessons, and tutorials. *Id.* DataCamp uses a "learn-by-doing" methodology, emphasizing interactive exercises, with tutorials making up only a small percentage of total coursework. *Id.* Learners may also enroll in more robust "certification" programs, as well as projects, assessments, and practice tools through which they may hone their skills. *Id.* ¶ 6.

While learner upskilling is the primary function and goal of the Platform, DataCamp also provides functionality to help learners connect and share their progress with others. *Id.* ¶ 8. When a learner completes a course, for example, they obtain a "Statement of Accomplishment," which they can share on social media. *Id.* In addition, DataCamp has "Leaderboards," where learners can view other learners' progress and rankings based on the amount of XP points they acquired over a period of time, as well as "Competitions" in which learners can participate. *Id.*

DataCamp also helps learners promote themselves through personalizable DataCamp profiles, called "Portfolios," akin to a LinkedIn professional profile. Portfolios auto-populate with a learners' course activity, making it easy for them to share their progress with others. *Id.* ¶ 9. Portfolios do not, however, auto-populate with identifying information; rather, learners must

---

[1] DataCamp is making a fact-based challenge to standing such that the Court may consider extrinsic evidence, including declarations and exhibits, in assessing whether it has jurisdiction. *Guadagno v. Wallack Ader Levithan Assocs.*, 932 F. Supp. 94, 95 (S.D.N.Y. 1996).

manually add their names, photos, locations, and other biographical information to their Portfolio. *Id.* All learners have the option to make their DataCamp Portfolio private—rendering it neither visible nor indexable by search engines—through a "Public Profile Visibility" setting available in both the settings menu and the Portfolio editing screen. *Id.* ¶ 10. A learner cannot edit, for example, the "About Me" section of their Portfolio without being presented with the "Public Profile Visibility" setting and the option to "[a]llow others to see my profile." *Id.*

### C. Plaintiff's Conclusory Allegations

Plaintiff has allegedly "subscribed to DataCamp since approximately 2015 and has taken many online video classes through DataCamp's platform." Doc. 1 ¶ 5. Plaintiff further alleges that, in May 2024, he took "classes on DataCamp in Python and Machine Learning" and, "as part of those courses, watched several video lectures." *Id.*

Plaintiff claims that, "without his consent," DataCamp shared his "video watching activity and his PII with Facebook and other third parties through the use of the Facebook Tracking Pixel and similar technologies." *Id.* According to Plaintiff, when a person is logged into Facebook and watches a "video" on the Platform, "the Pixel transmits PII from [] Facebook cookies to Facebook along with their PageView data." *Id.* ¶ 27. Specifically, Plaintiff alleges that the Pixel transmits PII from the Facebook "c_user cookie" that "contains a visitor's Facebook ID," which can then be used to "identify a Facebook profile." *Id.* ¶¶ 27–28. This information, allegedly, is "transmit[ed with] PageView data to Facebook, which includes the URL for each video." *Id.* ¶ 23. "All of the[] tracking technologies" at issue in this action "work in a similar fashion to the Facebook Tracking Pixel." *Id.* ¶ 34.

What Plaintiff does not allege is how an ordinary person would gain access to or interpret this data. As Plaintiff acknowledges, Pixel activity occurs at the "code" level. *See id.* ¶¶ 3, 18, 22, 26, 32–33. The cookies involved, meanwhile, are comprised of indecipherable "Names" and

"Values" not readily interpretable. *See id.* ¶ 26 (Name "c_user" has Value "679395441"); *id.* ¶ 32 (Name "ttwid" has Value "1%7CfeqzSSumIPvfujA4UdP…"). Meanwhile, Plaintiff offers no factual allegation from which to infer an ordinary person can decode a URL from the PageView data transmitted. This makes sense, as Plaintiff concedes the alleged PII is controlled, collected, and transmitted *by Facebook to Facebook via Facebook cookies* so that *Facebook* can send *Plaintiff* targeted ads. *Id.* ¶¶ 16–18, 27, 29; *accord Solomon,* 2025 WL 1256641, at *3 (adding "only Facebook's servers can access them").

Nonetheless, Plaintiff seeks to represent a nationwide class of all persons "who watched a video on datacamp.com," on whose behalf he seeks punitive statutory penalties under 18 U.S.C. § 2710(c). *Id.* ¶ 35 and Prayer for Relief.

### D. Plaintiff's Active Publicity of His Own DataCamp Activity

Plaintiff has long treated his DataCamp course activity as public information for others to see. For example, Plaintiff promotes his DataCamp coursework on his public LinkedIn profile, available at https://www.linkedin.com/in/henggao-cai-7b446266/, including by listing DataCamp courses under "Licenses and Certifications." Declaration of Max E. Kaplan ("Kaplan Decl.") ¶ 3; *id.* Ex. A.; *id.* Ex. B (listing DataCamp courses in "Kaggle R Tutorial on Machine Learning," "Deep Learning in Python," "Intermediate Python," "Intermediate R," "Intro to Python for Data Science," and "Introduction to R."). This does not happen automatically; a DataCamp learner must manually add DataCamp courses to their LinkedIn profile. Oliveira Decl. ¶ 11. Plaintiff also linked to his profile a DataCamp "Statement of Accomplishment" he received for completing the "Intermediate Python" course, which, when clicked, displays the course description and a list of the contents of each course chapter. Kaplan Decl. ¶ 4; *id.* Ex. C. It is not surprising, then, that Plaintiff made the "banner" of his public LinkedIn profile DataCamp's name, colors, and logo. Kaplan Decl. ¶ 2; *id.* Ex. A.

Plaintiff has taken a similarly public approach with his DataCamp Portfolio, available at https://www.datacamp.com/portfolio/hc525. Kaplan Decl. ¶ 5; *id.* Ex. D. There, Plaintiff chose to associate his identifying information—including his name, photograph, town, education, employer, highlighted technologies, and an "About Me" section—with an extensive (and continually updating) list of his "latest" and "completed" DataCamp courses. *Id.* This identifying information did not auto-populate; Plaintiff must have manually added it. *See* Oliveira Decl. ¶ 9. Plaintiff had multiple opportunities to, but did not, render this Portfolio "private." *See id.* ¶ 10.

**E. Plaintiff's Agreement to DataCamp's Terms of Use and Privacy Policy**

Plaintiff "has subscribed to DataCamp since approximately 2015." Doc. 1 ¶ 5. Around that time, DataCamp learners "agree[d] to our terms of service" by, *inter alia*, "signing up" to create an account at https://www.datacamp.com/users/sign_up. Oliveira Decl. ¶ 12. Learners also agree to DataCamp's operative Terms of Use and Privacy Policy every time they visit, browse, or use DataCamp's Platform. *Id*. ¶ 13. At all relevant times, DataCamp's Terms of Use and Privacy Policy have provided that DataCamp may change these terms and policies, and that "[y]our continued use of the Site after any such changes constitutes your acceptance of the new Terms and Conditions" and Privacy Policy. *Id.* ¶ 14 (quoting 2015 Terms of Use); *id.* ¶ 15 (quoting materially the same language from 2016 Privacy Policy). Indeed, in May 2021, DataCamp sent an email to all users (including Plaintiff) informing them of and summarizing updates to DataCamp's Terms of Use, advising that "[b]y continuing to use DataCamp, you agree to our updated Terms," and providing links to both the amended terms and DataCamp's Privacy Policy for the learners' review. *Id*. ¶ 19.

Effective November 17, 2022, DataCamp's Terms of Use included a "User Content" provision granting DataCamp a license to publicize user content:

> **8.1 User Content**
>
> User Content means any information and content that a user submits to, or uses with, the Service (e.g., ***content in the user's profile or postings***). …
>
> **8.2 License**
>
> You hereby grant…DataCamp an irrevocable…, non-exclusive, royalty-free and fully-paid-up, ***worldwide license*** to reproduce, ***distribute, publicly display***…, ***and otherwise use and exploit your User Content***, and to grant sublicenses of the foregoing rights, in connection with the Service through any medium, whether alone or in combination with other content or materials, ***in any manner and by any means*****,** method or technology…. You hereby irrevocably waive…any claims and assertions of moral rights or attribution with respect to your User Content.

*Id*. ¶ 17; *id*. Ex. A §§ 8.1, 8.2 (emphases added).

Effective of November 2, 2021, DataCamp's Privacy Policy informed learners that "[w]e automatically collect and process the following personal data about you when you browse or interact with the Websites and App:…your page views." Oliveira Decl. ¶ 17; *id*. Ex. B § 2. The Privacy Policy also informed Plaintiff that "[a]dvertising services may place cookies or other tracking technologies on your computer, phone, or other devices to collect data about your use of our services, and may access those tracking technologies in order to serve tailored advertisements to you." *Id.* § 8. DataCamp disclosed that these advertisement services included Facebook, Bing, Google, and LinkedIn, among others. *Id.* Learners are also directed to DataCamp's "Cookie Notice," which discusses, among other things, how to opt out of such cookie use. Oliveira Decl. ¶ 18; *id*. Ex. B § 9 and Ex. C § 4.

By continuing to use DataCamp's Platform in, among other times, May 2024, Plaintiff agreed to continue to be bound by DataCamp's operative Terms of Use, Privacy Policy, and Cookie Notice. He consented to and granted DataCamp a license to publicize his "User Content," which included all courses and identifying information listed on his DataCamp Portfolio. And he did so knowing of and accepting DataCamp's association with advertising services that use cookie-

based technologies (e.g., Pixels), and did not opt-out of their use. Oliveira Decl. ¶¶ 12–18; *id*. Ex. A §§ 8.1, 8.2, Ex. B § 9, and Ex. C § 4.

## ARGUMENT

### I. Plaintiff Lacks Article III Standing as a Matter of Fact.

#### A. Standard Applicable to a Rule 12(b)(1) Motion to Dismiss

A motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction "can raise a *facial* challenge based on the pleadings, or a *factual* challenge based on extrinsic evidence." *Guadagno v. Wallack Ader Levithan Assocs*., 932 F. Supp. 94, 95 (S.D.N.Y. 1996). Where the jurisdictional challenge is fact-based, as it is here, "no presumptive truthfulness attaches to the complaint's jurisdictional allegations," and "the burden is on the plaintiff to satisfy the Court, as fact-finder, of the jurisdictional facts." *Id.* In assessing whether it has jurisdiction, a court can "decide the matter on the basis of affidavits or it can hold an evidentiary hearing." *Id.* Either way, the plaintiff bears the "burden of proving by a preponderance of the evidence that subject matter jurisdiction exists." *U.S. Airlines Pilots Ass'n ex rel. Cleary v. US Airways, Inc*., 859 F. Supp. 2d 283, 296 (E.D.N.Y. 2012).

#### B. Plaintiff Cannot Demonstrate an Injury-in-Fact as Their Was No "Public" Disclosure of His "Private" Information.

To demonstrate standing, a plaintiff must establish three elements: (1) he has suffered an injury in fact; (2) the injury is "fairly traceable to the challenged conduct of the defendant"; and (3) the injury is "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Thus, to invoke this Court's jurisdiction, a plaintiff must have incurred an injury in fact "both concrete and particularized," meaning it must be "'real,' and not 'abstract.'" *Spokeo*, 578 U.S. at 340. A bare statutory violation does not suffice. *Id.* at 341 ("Article III standing requires a concrete injury even in the context of a statutory violation."). Hence, to assert a statutory

claim, a plaintiff must establish that he has experienced a concrete injury with "a close historical or common-law analogue," such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021).

In the context of VPPA, the "analogue" injury is the "public disclosure of private facts." *Salazar*, 118 F.4th at 542. VPPA "codifies a context-specific extension of the *substantive* right to privacy," intended to address "a video clerk leaking an individual customer's video rental history." *Eichenberger v. ESPN, Inc*., 876 F.3d 979, 983 (9th Cir. 2017); *In re Nickelodeon*, 827 F.3d at 290. Put differently, Congress enacted VPPA to keep individuals' choice of films and television to watch private. *See* S. Rep. No. 100-599, at 5 ("[I]t is nobody's business what Robert Bork…watch[es] on television…."). "Every step away from that 1988 paradigm will make it harder for a plaintiff to make out a successful claim." *In re Nickelodeon*, 827 F.3d at 290; *id*. at 284 ("Congress's purpose in passing [VPPA] was quite narrow.").

Plaintiff's claim is more than a step away from this original purpose—it is a full hike. Plaintiff asserts that DataCamp violated VPPA when his "video watching activity" was allegedly disclosed to sophisticated technology providers through DataCamp's use of Pixel technology. Doc. 1 ¶ 5. Plaintiff conspicuously fails, however, to allege that his DataCamp activity was private, or that he perceived such activity as private. Nor could he, as in reality, Plaintiff treats his DataCamp activity as public information for public consumption, including by: (a) promoting his DataCamp activity on social media; (b) granting DataCamp broad license and consent to disclose his DataCamp activity; and (c) doing so in venues more public than any alleged disclosure.

***a. Plaintiff, Not DataCamp, Publicized His DataCamp Activity.***

While an injury to a privacy interest can support standing (including under VPPA), an individual has no expectation of privacy in information *they make public*—including through social media. *See United States v. Meregildo,* 883 F. Supp. 2d 523, 526 (S.D.N.Y. 2012) (holding

defendant had no expectation of privacy in information he posted to Facebook and shared with Facebook friends); *Chaney v. Fayette Cnty. Pub. Sch. Dist.*, 977 F. Supp. 2d 1308, 1316 (N.D. Ga. 2013) (holding student had no expectation of privacy in photograph of her that she posted to her Facebook profile, "which she chose to share with the broadest audience available to her"); *United States v. Gines-Perez*, 214 F. Supp. 2d 205, 225 (D.P.R. 2002) (holding "as obvious" that someone who places information on the Internet, without taking any measures to protect the information, has no claim to privacy). Hence, in a privacy action, once information is "freely available to the public," no separate disclosure can cause injuries "sufficiently concrete to confer standing." *Crane v. Am. Bar Ass'n*, 663 F. Supp. 3d 747, 753 (E.D. Mich. 2023) (disclosure of information already published to "two well-trafficked websites" cannot support standing).

*United States v. Meregildo* is instructive. There, the defendant maintained a Facebook profile viewable by his Facebook "friends." 883 F. Supp. 2d at 525. The court held that the defendant "surrendered his expectation of privacy" when he posted to Facebook and shared those posts with others because a social media user's expectation of privacy in their social media posts "depends, *inter alia*, on the user's privacy settings." *Id.* at 525–26. "When a social media user disseminates his postings and information to the public," the court reasoned, there is no expectation of privacy. *Id.* at 525.

*Crane v. American Bar Association* is similarly instructive. In *Crane*, the plaintiff claimed that the ABA unlawfully disclosed his status as an ABA member and subscriber in violation of Michigan's Preservation of Personal Privacy Act. 663 F. Supp. 3d at 752. The court found that plaintiff had "already published all of the information he says would cause him injury if disclosed," including on "two well-trafficked websites: his law firm's, and that of the State Bar of Michigan" and held that it lacked subject-matter jurisdiction under the Michigan Preservation of Personal

Privacy Act. *Id.* at 751–52. Although a person may maintain *some* privacy interest in public facts, the court reasoned, "there is a point at which information is no longer subject to any privacy interest at all." *Id.* at 752. As plaintiff has himself disclosed "substantially the same information," the court held, "the injury about which [plaintiff] complains is not sufficiently concrete to confer standing and allow him to invoke the jurisdiction of the federal courts." *Id.* at 752-53.

Here, as in *Meregildo* and *Crane*, Plaintiff made his DataCamp course activity "freely available" to the public, including by posting it on his publicly-accessible LinkedIn and DataCamp profiles.[2] LinkedIn gives its members "numerous privacy protections and privacy choices." *See hiQ Labs, Inc. v. LinkedIn Corp.*, 2021 WL 1531172, at *1 (N.D. Cal. Apr. 19, 2021). Instead, Plaintiff repeatedly chose to leverage LinkedIn's platform to *publice his DataCamp activity on this public LinkedIn profile*, including by manually adding his course history under "Licenses and Certifications"; sharing his DataCamp "Statement of Accomplishment"; and dedicating his LinkedIn banner to DataCamp. Kaplan Decl. ¶¶ 2–4; *id.* Exs. A–C. Plaintiff has, in no uncertain terms, "surrendered his expectation of privacy" in this information.

Plaintiff's decision to add his information to his public DataCamp Portfolio is even more comprehensive. Unlike LinkedIn, to which Plaintiff manually added his DataCamp activity, the DataCamp Portfolio reflects a learners' DataCamp activities as they engage with the Platform—if you take a course, it is reflected. Oliveira Decl. ¶ 9. The Portfolio, however, *does not auto-populate with identifying information*; rather, should a learner wish to associate his identity with his Platform activity, he must manually add his own biographical information. *Id.* Plaintiff did so,

---

[2] As the Sixth Circuit acknowledged, LinkedIn is "the world's largest online professional network." *Hudson v. Datanyze, LLC*, 2025 WL 80806, at *1 (6th Cir. Jan. 13, 2025).

choosing to publicly associate his course activity with his name, photo, town, etc., and therefore with himself.

As in *Meregildo* and *Crane*, here, because Plaintiff has already disclosed the DataCamp courses he has taken, Plaintiff cannot demonstrate the "public disclosure of private facts" necessary to establish standing in a VPPA action, as any "public disclosure" was of "public facts" made "public" by Plaintiff. Having "published to the entire world the very facts he claims [DataCamp] revealed," plaintiff no longer has a "legitimate expectation of privacy," and he cannot "now be heard to complain that he was injured by [DataCamp's] re-publication of what [plaintiff] then revealed and continues to reveal." *Crane*, 663 F. Supp. 3d at 752.

***b. Plaintiff Granted DataCamp License and Consent to Disclose His DataCamp Activity.***

Plaintiff has also made clear that he did not seek to maintain control over any purportedly "private" DataCamp activity. By registering with and using the Platform over the subsequent decade, Plaintiff agreed to and adopted both DataCamp's Terms of Use and Privacy Policy. Oliveira Decl. ¶¶ 12–13. In doing so, Plaintiff granted DataCamp a license to use and publicize the data he now claims DataCamp unlawfully disclosed, namely his DataCamp coursework and activity reflected on his public DataCamp Portfolio. *Id*. Ex. A § 8.1 ("User Content" includes "content in the user's profile or postings"); *id.* § 8.2 ("You hereby grant…DataCamp an irrevocable…worldwide license to…distribute, publicly display…and otherwise use and exploit your User Content…in any manner and by any means."). He did so knowing and agreeing, via his acceptance of the Privacy Policy, that DataCamp (a) automatically collects personal data about his Platform interactions, including "page views," and (b) associates with advertising services (including Facebook, Bing, Google, and LinkedIn) that use cookie and other tracking technologies. Oliveira Decl. ¶ 17; *id*. Ex. B § 2 ("We automatically collect and process the following personal

data about you when you browse or interact with the Websites and App…your page views"); *id.* § 8 ("Advertising services may place cookies or other tracking technologies on your computer, phone, or other devices to collect data about your use of our services…."). And, he chose not to opt out of the use of such technologies, despite being fully informed via DataCamp's Cookie Notice of this option. Oliveira Decl. ¶ 18; *id.* Ex. C § 4.

Plaintiff provided DataCamp with a broad, global authorization to disclose his data. Without an *unauthorized* disclosure, there is no concrete harm. *Salazar*, 118 F.4th 533 at 542 (holding exposure to "*unauthorized* third party" caused concrete harm). Here, based on the broad authorization granted under DataCamp's terms, there could be no unauthorized disclosure and therefore no concrete harm.

***c. Unlike Plaintiff's Publication of His Information, Any Disclosure by DataCamp Remained Private.***

By comparison, there was no "public" disclosure by DataCamp. Article III standing requires an injury with "a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424. The Third, Seventh, Tenth, and Eleventh Circuits have held that consumers cannot bring federal statutory claims challenging private, business-to-business disclosures. *See Barclift v. Keystone Credit Services, LLC*, 93 F.4th 136, 145 (3d Cir. 2024); *Nabozny v. Optio Solutions LLC*, 84 F.4th 731, 733 (7th Cir. 2023); *Shields v. Professional Bureau of Collections of Maryland, Inc.*, 55 F.4th 823, 827 (10th Cir. 2022); *Hunstein v. Preferred Collection & Mgmt. Srvs., Inc.*, 48 F.4th 1236, 1240 (11th Cir. 2022) (en banc). Notably, each Circuit Court reached this conclusion from a different angle, yet all agree that business-to-business disclosures are fundamentally unlike the public disclosures actionable at common law. Here, Plaintiff's "video viewing" information was allegedly disclosed only to sophisticated technology companies such as Facebook, solely for the purpose of sending Plaintiff

ads tailored to his interests. Therefore, Plaintiff's allegations are missing the "essential" publicity element necessary to establish a concrete injury. *TransUnion*, 594 U.S. at 434 & n.6.[3]

**II. Plaintiff Cannot State a Claim Under VPPA.**

The Complaint should separately be dismissed because Plaintiff has not plausibly alleged a VPPA violation. To state a claim under the VPPA, a plaintiff must allege that (1) defendant is a regulated entity (a "video tape service provider"), (2) he is a protected party (defendant's "consumer"), and (3) defendant engaged in prohibited conduct (knowingly disclosing plaintiff's "personally identifiable information" to a third party). *Salazar v. Paramount Glob.*, 133 F.4th 642, 649 (6th Cir. 2025); *accord, e.g.*, *Martin v. Meredith Corp.*, 657 F. Supp. 3d 277, 284 (S.D.N.Y. 2023). Plaintiff's Complaint fails as to each element. As set forth below: (1) Pixels do not, as a matter of binding precedent, transmit PII; (2) the URLs allegedly disclosed do not identify "specific video materials"; (3) DataCamp did not posses, let alone disclose, the alleged identifying information, i.e., cookie information; (4) no alleged PII disclosure was "knowing"; and (5) DataCamp is not a "video tape service provider" and, therefore, Plaintiff is not a consumer.

**A. Standard Applicable to a Rule 12(b)(6) Motion to Dismiss**

To survive a motion to dismiss under Rule 12(b)(6), the complaint must contain sufficient facts to state a plausible claim that rises "above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Factual allegations beyond "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" must be pled. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully."

---

[3] DataCamp acknowledges that the Second Circuit reached the opposite conclusion in *Salazar v. National Basketball Association*. *See* 118 F.4th at 542. However, on March 14, 2025, the NBA filed a Petition for a Writ of Certiorari in the U.S. Supreme Court seeking review of this holding. *Nat'l Basketball Ass'n v. Salazar*, Case No. 24-994 (Pet. Writ Cert. Mar. 14, 2025). Salazar's response to the petition is currently due by July 1, 2025. DataCamp reserves its right to seek a stay in this matter pending the outcome of this appeal as standing is a threshold issue.

*Iqbal*, 556 U.S. at 678. The assumption of truth is inapplicable to legal conclusions or to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" or factually unadorned allegations. *Id*.

### B. Under the Second Circuit's "Ordinary Person" Standard, Pixels Do Not Transmit "Personally Identifiable Information."

The Second Circuit precedent is clear: data transmitted through Pixel technology—particularly the "PageView" and "cookie"-based identifiers at issue here—do *not* qualify as PII under VPPA. *Solomon,* 2025 WL 1256641, at *10–11.

To qualify as "personally identifiable information" under VPPA, a disclosure must "identif[y] a person as having requested or obtained specific video materials" from a "video tape service provider." 18 U.S.C. § 2710(a)(3). Put differently, the information must "readily permit an *ordinary person* to identify a specific individual's video-watching behavior." *Solomon,* 2025 WL 1256641, at *7 (emphasis added). When making this assessment, the court does not look at what the recipient (e.g., a sophisticated technology company like Facebook) can extract from a disclosure, *id.* at *8 (explicitly rejecting the First Circuit's "reasonable foreseeability" approach); rather, the court must ask whether the disclosure "would, *with little or no extra effort*, permit an ordinary person to identify [plaintiff's] video-watching habits." *Id.* at *10–11 (emphasis added) (favorably discussing *In re Nickelodeon*, 827 F. 3d 262; *Eichenberger*, 876 F.3d 979).

This follows from "the words of the statute, the specific context in which the language is used, and the broader context of the statute as a whole." *Id.* at *9. VPPA is a penal statute which targets "knowing" violations; it "does not make sense" that the recipient's "level of sophistication" would control. *Id.* An "ordinary person" standard "better informs [defendants] of their obligations." *Id.* VPPA is also a "limited" statute, and Congress has repeatedly chosen to keep its scope narrow. *Id.* at *9–10 (noting that, when updating VPPA in 2013, Congress chose not to

broaden the definition of PII to capture Internet technologies, even "in the face of testimony asking" for one).[4] Given this context and history, it is irrelevant whether a sophisticated third party can "assemble otherwise anonymous pieces of data to unmask the identity of individual [users]"; rather, in assessing whether VPPA applies to a disclosure, courts must be guided by the "classic example" of "a video clerk leaking an individual customer's video rental history." *Id.* at *10 (quoting *In re Nickelodeon*, 827 F.3d at 290).

Applying this standard, the Second Circuit held in *Solomon v. Flipps Media, Inc.* that the disclosure of user information via Pixels simply cannot satisfy a plaintiff's pleading obligations under *Iqbal/Twombly*. There, as here, plaintiff alleged that whenever she viewed a video on defendant's website, a Facebook Pixel transmitted the visited URL and her Facebook ID in the form of "PageView" and "c_user" cookie data. *Id.* at *3. There, the plaintiff claimed that since one's "viewing history" can be derived from a URL and Facebook ID, the Pixel use violated VPPA. *Id.* The Second Circuit disagreed, instead finding it "implausible" that an "ordinary person" could derive such information. *Id.* at *10. Specifically, the Second Circuit held "it is not plausible that an ordinary person" would: (a) identify the relevant information "interspersed with many characters, numbers, and letters"; (b) understand that information to contain a "video title"; (c) know that a "c_user" cookie reflects a person's Facebook ID; or (d) know how to use this information to identify the individual. *Id.* at *11 (rejecting as conclusory plaintiff's allegation that entering "facebook.com/[Solomon's FID]" to reach an individual's profile "is generally and

---

4 By contrast, in enacting the Children's Online Privacy Protection Act, Congress chose to include in the definition of "personal information," *inter alia,* "any other identifier that the [Federal Trade Commission] determines permits the physical or online contacting of a specific individual" and/or "information concerning the child or the parents of that child that the website collects online from the child and combines with an identifier described in this paragraph." *Solomon,* 2025 WL 1256641, at *10.

widely known among the public"). Plaintiff could not even allege "how an ordinary person might access the information on the Pixel's PageView."*Id.* Simply put, the "video-watching" information buried in a Pixel's PageView and cookie data is not PII under VPPA.

Plaintiff's claim cannot proceed in light of *Solomon*. As in *Solomon*, Plaintiff alleges that the Facebook Pixel ("a piece of code") embedded in DataCamp's Platform "transmits PII from [] Facebook cookies" (namely, the "c_user cookie") "to Facebook along with [] PageView data" that "includes the URL for each video page." Doc. 1 ¶¶ 18, 23, 27. In support, Plaintiff includes exemplar screenshots of "cookies" allegedly found on DataCamp's Platform, which capture rows of indecipherable computer code—including one line named "c_user" with the value "679395441." *Id*. ¶¶ 26, 32. He further alleges that "[a]ll of the[] tracking technologies" at issue "work in a similar fashion to the Facebook Tracking Pixel." *Id.* ¶ 34. Plaintiff does not, however, explain how an "ordinary person" would come to view or understand Pixel PageView data or, "with little to no effort," identify and translate cookie values (e.g., "679395441") into PII. Nor can he, as "only Facebook's servers can access" cookie data. *Solomon,* 2025 WL 1256641, at *3. At most, he asserts that "[a]nyone can identify a Facebook profile…by appending the Facebook ID to the end of facebook.com," *id*. ¶¶ 27–28, but the Second Circuit expressly rejected this allegation as conclusory and insufficient. *Solomon,* 2025 WL 1256641, at *11. Following *Solomon*, it is simply "not plausible" that an ordinary person would decipher video titles buried in PageView data, or "see the 'c_user' phrase on [DataCamp's] servers and conclude that the phrase was a person's FID." *Id.* at *11.

Plaintiff claims DataCamp violated VPPA because Pixel technology shares PageView and cookie data that, together, can be used by sophisticated technology companies to identify his video viewing activity. Doc. 1 ¶¶ 1–4. He utterly fails, however, to offer any factual allegation to suggest

an ordinary person, with little or no extra effort, as opposed to sophisticated technology companies, could readily apprehend the same information. And indeed, the Second Circuit has now held that such technology *does not* transmit PII. Under binding precedent, therefore, this action should be dismissed with prejudice.

### C. Plaintiff Fails to Allege DataCamp Transmitted PII, as DataCamp URLs Do Not Identify "Specific Video Material."

Disclosure of a URL might be actionable under VPPA if, and only if, the URL identifies plaintiff as having "requested or obtained specific video materials or services." 18 U.S.C. § 2710(a)(3). "[S]ending a URL of a [] webpage which may or may not include a video does not show that a person requested or obtained specific video materials or services" and will not support a VPPA claim. *Martin v. Meredith Corp.,* 657 F. Supp. 3d 277, 285 (S.D.N.Y. 2023) (no VPPA violation where People.com URL did not "identify a person as having requested or obtained the video on that page"). By contrast, disclosing a URL may be actionable if it "includes the name of the video within it and links to the video." *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 717 (N.D. Cal. 2023) (denying motion to dismiss on these grounds). Simply put, if an "ordinary person" cannot tell a URL link contains a "video," VPPA is not in play. *Solomon,* 2025 WL 1256641, at *11.

Here, it is apparent from the Complaint that the URL data allegedly disclosed lacks this key information; instead, all that is allegedly transmitted are "course," "chapter," and "exercise number" references, none of which identify "specific" video materials or confirm that a video is available at that address. For example, Plaintiff alleges that he took classes on DataCamp's Platform in Python and Machine Learning as recently as May 2024. Doc. 1 ¶ 5. Currently, the first exercise in "Chapter 1: Python Basic" of the course "Introduction to Python" is a tutorial titled "Hello Python!":




Oliveira Decl. ¶ 7.[5] The URL for this exercise (https://campus.datacamp.com/courses/intro-to-python-for-data-science/chapter-1-python-basics?ex=1) does not, however, reference this title. Nor does it indicate that this first exercise ("ex=1") is a tutorial or involve any "specific" material at all. Indeed, the URL for the next exercise in the chapter (an interactive code-terminal lesson titled "Your first Python code") is similarly oblique: https://campus.datacamp.com/courses/intro-to-python-for-data-science/chapter-1-python-basics?ex=2. Despite linking to different types of experiences and content, these URLs differ in only one digit: "ex=1" vs. "ex=2."[6]

This same convention is repeated for all courses across the Platform. For example, the Complaint also references a "video course" entitled "Introduction to SQL" available at https://campus.datacamp.com/courses/introduction-to-sql/relational-databases?ex=1.[7] Doc. 1 ¶ 24. Plaintiff claims, without explanation, that this URL "describes the contents of the videos that

---

5 The Court may take judicial notice of the information contained on DataCamp's website because it has been incorporated by reference in the Complaint, is central to Plaintiff's claim, its authenticity is not in dispute, and it is capable of accurate and ready determination. *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 463 (S.D.N.Y. 2020).

6 DataCamp does not concede, and expressly disputes, that "Hello Python!" or any course tutorial on the DataCamp platform is a "video" covered by VPPA.

7 Plaintiff does not allege that he took this course, or viewed any associated "videos."

they link to." *Id.* That is demonstratively false, as a click on the link instead brings a learner to a tutorial entitled "Databases":




The URL does not reference the tutorial, "Databases"; rather, like the "Introduction to Python" example, it references the course ("introduction-to-sql"), the chapter ("relational-databases"), and the exercise number ("ex=1"). And, like "Introduction to Python," the URL provides no information about the actual exercise. Compare, for example, Exercise 2 in this chapter (an interactive multiple-choice exercise titled "What is inside a database?") available at https://campus.datacamp.com/courses/introduction-to-sql/relational-databases?ex=2. Again, despite sharing all but one digit ("ex=1" vs. "ex=2"), these URLs point to entirely different types of materials.

Here, as in *Martin*, the allegedly disclosed URL does not contain the name of any "video" or even indicate that "video" material is present. To the contrary, URLs within a given chapter are essentially identical (i.e., lack any exercise-specific information) regardless of the type of content found at that URL. As in *Solomon*, there is no *plausible* explanation for how an "ordinary person" could look at a DataCamp URL and determine it linked to *any* video, let alone "specific video

materials," with "no extra effort," e.g., logging into DataCamp, visiting the URL, and actually engaging in the exercise. *Solomon,* 2025 WL 1256641, at *10. Thus, no PII could be shared, and, as in *Solomon*, Plaintiff's claim must fail.

**D. The Complaint Does Not Allege DataCamp Possessed or Disclosed Plaintiff's PII.**

To state a claim under VPPA, Plaintiff must allege that DataCamp not only disclosed his PII, but possessed it. *See Eichenberger*, 876 F.3d at 986 (rejecting VPPA claim where defendant never possessed the information necessary to identify plaintiff); *Chutich v. Green Tree Acceptance, Inc.*, 1993 WL 173813, at *9 (D. Minn. Apr. 19, 1993) ("[A] corporation cannot disclose what it does not know…."). As the Complaint makes clear, the Pixels, cookies, and any PII allegedly transmitted were owned and/or controlled by sophisticated technology companies such as Facebook, not DataCamp. *See* Doc. 1 ¶ 27 ("When someone who is logged into Facebook watches a video on the Website, the Pixel transmits PII from these Facebook cookies to Facebook."); *id.* ¶ 29 ("PII from Facebook's cookies embedded on the Website permits Facebook to see who watched what video."). Indeed, as "c_user cookies are created and placed by Facebook on the Facebook users' browsers, only Facebook's servers can access them." *Solomon*, 2025 WL 1256641, at *3.

Regardless, it was Plaintiff's browser, not DataCamp, that transmitted any identifier. As Facebook's "Cookie Policy" conveys,[8] cookies are small pieces of text used to store information on web browsers. *Id.* It "just sits on the browser and gets sent along with information that would otherwise be sent." *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 142 (3d Cir. 2015); *see also In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1093–94 n.3 (N.D. Cal. 2015) ("A 'cookie' is a file on a user's computer."). Thus when a Pixel is triggered, the cookie's owner

---

[8] *See* Facebook Cookies Policy, https://www.facebook.com/policies/cookies/.

(e.g., Facebook) *pulls* the cookie-stored information from the user's browser, and not the website owner. Numerous courts have acknowledged this reality.[9]

Plaintiff nonetheless seeks to hold DataCamp liable because the Platform "contains code" that creates the risk that "Plaintiff's web browser" could transfer his information to a third party. the Pixel. Doc. 1 ¶¶ 22, 44. This is insufficient. VPPA imposes liability only on a party that "*discloses*" PII, not a party that contributed to the risk of disclosure. *Cf. United States v. Sylvester*, 605 F.2d 474, 475 (9th Cir. 1979) (holding statute reaching "one who 'causes [wildlife]' to be sold" is "far more broadly worded" than a statute applicable to only persons who "sell[]" wildlife). When interpreting statutory language, courts must honor the precise words used. *Griffith v. Steiner Williamsburg, LLC*, 760 F. Supp. 2d 345, 355 (S.D.N.Y. 2010). This is particularly true in penal statutes, such as VPPA, where "it is appropriate to apply the rule of lenity in resolving any ambiguity in the ambit of the statute's coverage." *Crandon v. United States*, 494 U.S. 152, 158 (1990); *see also Cenveo, Inc. v. Rao*, 659 F. Supp. 2d 312, 316 n.3 (D. Conn. 2009) (noting rule of lenity applies to civil action brought under Title 18). Absent allegations that DataCamp *directly* disclosed his PII, as opposed to allowing the circumstances for disclosure, Plaintiff's VPPA claim must again fail.

---

[9] *See, e.g., Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 664 (S.D.N.Y. 2015) ("[T]hrough its 'c_user' cookie, Facebook's code allegedly forces a user's web browser to look for the user's Facebook ID."); *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 948 (N.D. Cal. 2017) ("Facebook puts cookies on visitors' computers," such as the "c_user cookie"); *accord Buechler v. Gannett Co., Inc.*, No. 22-1464, 2023 WL 6389447, at *4 (D. Del. Oct. 2, 2023) (dismissing VPPA claim as "the subscriber-users themselves and/or Facebook—not [defendant]—implement the 'Tracking Methods'…that result in the disclosure of Plaintiffs' PII and Video Watching Data to Facebook"); *cf. Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066–67 (9th Cir. 2015) (rejecting VPPA claim where the alleged disclosure of PII to third parties resulted from the plaintiffs' own decision to give those parties access to their Netflix accounts).

### E. DataCamp Did Not "Knowingly" Disclose PII.

Plaintiff also fails to plausibly allege any "*knowing* disclosure" of PII by DataCamp, as it did not have access to Plaintiff's alleged PII (namely, "c_user" cookie) or know that Facebook would obtain it. § 2710(b)(1) (emphasis added). VPPA "views disclosure from the perspective of the disclosing party…, not [from] what the recipient of that information decides to do with it." *Solomon,* 2025 WL 1256641, at *9. "If [the defendant] did not think it was conveying PII, then there could be no knowledge of the conveyance, regardless of whether it knew what Facebook might do with the information." *Bernardino v. Barnes & Noble Booksellers, Inc*., 2017 WL 3727230, at *8 (S.D.N.Y. Aug. 11, 2017). This makes sense: "knowingly" means "actual knowledge" and "consciousness of transmitting the private information." *In re Hulu Priv. Litig*., 86 F. Supp. 3d at 1095. "It does not merely mean transmitting the code," and "[i]t is not enough…that a disclosure be merely 'voluntary' in the minimal sense of the defendant's being 'aware of what he or she is doing[.]'" *Id.*

But Plaintiff does not allege DataCamp "knowingly disclosed" his PII; rather, he alleges that, because DataCamp "utilized" the Pixel, it caused "Plaintiff's web browser to transfer Plaintiff's identifying information." Doc. 1 ¶ 44. But Congress "knew how" to "impose…liability" for causing a disclosure: "it did not." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176–77 (1994). Consider the Electronic Communications Privacy Act ("ECPA"), an analogous federal privacy statute "on which the VPPA was modeled." *In re Hulu*, 86 F. Supp. 3d at 1095. Under the ECPA, allegations that a defendant "created or contributed" to a "risk" that data would be disclosed by a third party are insufficient to support a claim. *Worix v. MedAssets, Inc.*, 869 F. Supp. 2d 893, 896 (N.D. Ill. 2012); *see also, e.g.*, *Willingham v. Global Payments, Inc.*, 2013 WL 440702, at *12 (N.D. Ga. Feb. 5, 2013) (that defendant "contributed" to a disclosure insufficient to establish the defendant "knowingly divulge[d]" such information under

the ECPA). That DataCamp allegedly created the conditions for disclosure cannot support a claim, and the Complaint is therefore facially inadequate.

Nor do DataCamp's alleged actions otherwise support a claim. At most, Plaintiff alleges "the Facebook Tracking Pixel on datacamp.com is configured to transmit PageView data," Doc. 1 ¶ 23, but that is only half of the equation. *See id.* ¶ 29 (alleging "[t]he combination of the PageView data and the PII from Facebook's cookies…permits Facebook to see who watched what video"). Plaintiff does not allege DataCamp created, controlled, or could access any cookies, or that DataCamp otherwise took active steps to associate Plaintiff with his PageView data.[10] Nor could he, as "c_user cookies are created and placed by Facebook on the Facebook users' browsers, [and] only Facebook's servers can access them." *Solomon,* 2025 WL 1256641, at *3.

Further, given the technology at issue, DataCamp *cannot* know whether Plaintiff's PII was even disclosed. As recognized in *Martinez v. D2C, LLC*, several conditions must be met for a Pixel to transmit identifying information to Facebook. 2024 WL 4367406, at *7 (S.D. Fla. Oct. 1, 2024). Specifically, and among other things, a user must concurrently:

1. have a Facebook account;
2. be logged into his Facebook account;
3. be logged into Facebook on the same device;
4. be logged into Facebook using the same browser;
5. use a browser that does not block Pixels by default

[10] *Cf. Lamb v. Forbes Media, LLC*, 2023 WL 6318033, at *11 (S.D.N.Y. Sept. 28, 2023) (allegations Forbes "*knows* that Facebook will match the Advanced Matching parameters with a subscriber's subsequent activity," that "Forbes *integrated or installed* the Facebook Tracking Pixel into its website," and that Forbes "*chose to activate* the optional 'Advanced Matching'" tool held sufficient to allege a "knowing disclosure" (emphases added)); *Lee v. Springer Nature Am., Inc.*, No. 24-4493, 2025 WL 692152, at *17 (S.D.N.Y. Mar. 4, 2025) (allegation defendant "installed the pixel, knowing that it would transmit his personal information to Facebook" supported "knowing disclosure" element).

6. not have deployed any number of browser settings that block Pixels or cookies; and
7. not have deployed any number of add-on software that block Pixels or cookies.

*Id.* at *7–8. Here, Plaintiff does not even allege that he was logged into Facebook while on DataCamp's Platform, let alone on the same device or browser. As these conditions are beyond what DataCamp can know for any given user, it would be impossible for DataCamp to have knowledge of any resulting disclosure.

### F. DataCamp Is Not a "Video Tape Service Provider," and Plaintiff Is Not a "Consumer," Under VPPA.

VPPA only applies to "video tape service provider[s]," i.e., those "engaged in the business…of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Similarly, only a "consumer", i.e., a "renter, purchaser, or subscriber of goods or services from a video tape service provider," may assert a claim. § 2710(a)(1). If a defendant is not a "video tape service provider," plaintiff cannot be a "consumer," and the claim fails. *Paramount,* 133 F.4th at 649 n.7.

To be clear, DataCamp is an "online learning platform." Doc. 1 ¶ 21. While Plaintiff alleges that its courses have "online video" components (which DataCamp disputes), *id.*, that is at best a tertiary offering of DataCamp's business as an online learning and professional development platform. An advocacy group does not become a "video tape service provider" simply because it "creates its own video content" viewable on its website. *Markels v. AARP*, 689 F. Supp. 3d 722, 728 (N.D. Cal. 2023). Nor does a university suddenly become a "video tape service provider" simply because a professor opens a lecture with a funny movie clip—that would be absurd. *Cf. Osheske v. Silver Cinemas Acquisition Co.*, 2024 WL 5487091, at *3 (9th Cir. Mar. 27, 2025) (movie theater not subject to VPPA as "publicly accessible sites of shared synchronous viewing" are not equivalent to the privacy of the "home" or "living room"). Rather, for VPPA to attach, a

plaintiff must allege facts showing that "providing video content is a substantial or significant purpose" of defendant's business. *Markels*, 689 F. Supp. 3d at 728.

Plaintiff has not and cannot meet this standard. DataCamp's courses are made up of a series of interactive exercises, including multiple-choice exercises, terminal coding lessons, and tutorials. DataCamp uses a "learn-by-doing" methodology, emphasizing interactive exercises, with tutorials making up only a small percentage of total coursework. Oliveira Decl. ¶ 5. In addition, DataCamp's "Leaderboards," which show learners' rankings based on the amount of XP points acquired over a period of time, do not indicate how the XP was acquired (e.g., whether through exercises, projects, tutorials, etc.) *Id.* ¶ 8. Like the movie theater in *Osheske*, DataCamp's Platform is a "publicly accessible site" for learners to share their coursework and engage in community-based competitions. That a course may contain tutorial exercises does not render the course itself a "prerecorded video cassette tape" or an "audio visual material," nor does it make participating in a course equivalent to the privacy of the "home" or "living room." *See Paramount*, 133 F.4th at 653 (holding that plaintiff did not plausibly allege a newsletter, which contained links to videos and directed subscribers to video content, was "audio visual material" sufficient for VPPA to apply). Simply put, the "substantial purpose" of DataCamp is education and development, not the "rental, sale, or delivery" of prerecorded video cassette tapes. DataCamp therefore is not a "video tape service provider," Plaintiff is not a "consumer," and Plaintiff's claim must fail.[11]

## CONCLUSION

For the foregoing reasons, Plaintiff's Complaint must be dismissed with prejudice.

---

[11] Plaintiff is similarly not a "consumer" because he subscribes to DataCamp's interactive learning platform broadly, not any alleged "video" component. This distinction is currently the subject of a circuit split. *Compare Salazar,* 118 F.4th 533, *with Paramount*, 133 F.4th 642. DataCamp reserves the right to raise this argument should this split resolve or develop.

Respectfully submitted,

Dated: May 12, 2025
Philadelphia, PA

**COZEN O'CONNOR**

By: /s/ Max E. Kaplan______________________
Max. E. Kaplan
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone: 215-665-2000
Fax: 215-665-2013
mkaplan@cozen.com

*Attorneys for Defendant*
*DataCamp, Inc.*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing memorandum of law is limited to 8,750 or fewer words and otherwise complies with the requirements of Rule 7.1(c) of the Local Rules of this Court.

*/s/ Max E. Kaplan*

Max E. Kaplan

## CERTIFICATE OF SERVICE

I, Max E. Kaplan, hereby state that on May 12, 2025, I caused this Memorandum to be served on all counsel of record in the above-referenced action via email.

*/s/ Max E. Kaplan*

Max E. Kaplan